UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                          :

MOTORS LIQUIDATION CO.,              :

                                :

                      Debtor.     :        12 Civ. 4948 (JMF)
-------------------------------------------------------------------X
KELLY CASTILLO ET AL.,          :        OPINION AND ORDER

                                :

                   Appellants    :

     -v-                             :

                                :

GENERAL MOTORS, LLC,        :

                                :

                   Appellee.     :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This appeal arises out of an adversary proceeding related to the Chapter 11 bankruptcy of

Motors Liquidation Company, formerly known as General Motors ("Old GM").  After Old GM

filed for bankruptcy, General Motors LLC ("New GM") purchased the majority of Old GM's

assets pursuant to Section 363 of the Bankruptcy Code.  Appellants, Kelly Castillo et al. (the

"*Castillo* Plaintiffs"), seek a declaratory judgment that, in doing so, New GM assumed liability

for a settlement agreement between them and Old GM relating to a class action lawsuit in the

Eastern District of California (the "*Castillo* Settlement").  After a bench trial on a stipulated

record, the United States Bankruptcy Court for the Southern District of New York (Robert E.

Gerber, Bankruptcy Judge) held that New GM did not assume liability for the settlement

agreement.  For the reasons that follow, the Bankruptcy Court's judgment is affirmed.[1]

---

[1]      Almost a year after this appeal was filed, and shortly after it was reassigned to the
undersigned, New GM filed a motion to dismiss on the grounds of judicial estoppel.  (Mot.
Dismiss, Docket No. 29, 12cv4948).  In that motion, New GM asserted that, after this appeal was
filed, the Bankruptcy Court had allowed claims for attorneys' fees as well as individual claims
against Old GM based on the *Castillo* lawsuit and that some of these claims had already, in fact,

## BACKGROUND

### A. The Settlement Agreement

In October 2007, Appellants brought a class action lawsuit in the United States District Court for the Eastern District of California against Old GM on behalf of themselves and other current and former Saturn vehicle owners, whose vehicles contained an allegedly defective Saturn VTi transmission.  (Compl. (Docket No. 1), *Castillo v. General Motors Corp.*, 07cv2142 (WBS) (E.D. Cal. Oct. 10, 2007)).  The Saturn vehicles had been sold with a warranty (the "glove-box warranty") that covered "repairs to correct any vehicle defect related to materials or workmanship" that occurred within three years or 36,000 miles, whichever came first.  (Docket No. 69, Ex. G ("Warranty"), at 7).[2]  Old GM voluntarily extended this coverage to defects that occurred within five years or 75,000 miles, whichever came first.  (Docket No. 71, Ex. V; Docket No. 75, Ex. PP).  Although the *Castillo* Plaintiffs' transmissions failed after the warranty had expired, they contended that Old GM was nevertheless liable for the resulting damages.  (*See* Second Am. Class Action Compl. ("SAC") ¶¶ 38-61, 69-108 (Docket No. 55), *Castillo v. General Motors Corp.*, 07cv2142 (WBS) (E.D. Cal. Sept. 12, 2008)).  They alleged four claims: (1) statutory consumer fraud; (2) breach of express warranties; (3) breach of implied warranty of merchantability; and (4) unjust enrichment.  (*Id.* ¶¶ 69-108).

In July 2008, following mediation, Appellants and Old GM settled the lawsuit. (Stipulation of Settlement, Docket No. 68, Ex. B).  Pursuant to the settlement agreement, Old

been paid.  (*Id.* ¶ 8).  Because the holders of claims based on the *Castillo* Settlement were being paid by Old GM, New GM argued, they should not be allowed to also seek recovery from New GM through this appeal. (*Id.* ¶ 2).  Because the motion does not argue that this Court lacks jurisdiction and because, on the merits, the Court affirms the Bankruptcy Court's decision in favor of New GM, this Court need not, and does not, address the motion.  Instead, the motion is denied as moot.

[2]      Unless otherwise specified, all docket references in this Opinion are to the Bankruptcy Court's docket in the adversary proceeding, No. 09-ap-00509.

GM agreed to reimburse class members for certain costs incurred if their VTi transmission malfunctioned within 125,000 miles of purchase or lease; to pay the costs of class notice and claims administration; to pay incentive fees to the named class plaintiffs; and to pay class plaintiffs' attorneys fees and expenses.  (*Id.* ¶¶ III.1, III.5, III.7).  In exchange, class members released all claims.  (*Id.* ¶ III.12).  Old GM did not admit liability as part of the settlement, and in fact, "expressly denie[d] any . . . wrongdoing or liability in connection with any facts or claims that [were] or could have been alleged against it in the" lawsuit.  (*Id.* ¶ I.5).

On February 3, 2009, even before the District Court had granted final approval to the settlement agreement, Old GM, in an effort to "enhance customer satisfaction," instructed its dealers to repair malfunctioning VTi transmissions and reimburse their owners in accordance with the terms of the agreement.  (Admin. Bulletin, Docket No. 73, Ex. MM).  On April 14, 2009, the District Court granted final approval of the settlement and entered judgment that was to become effective June 2, 2009.  (Final Judgment (Docket No. 74), *Castillo v. General Motors Corp.*, 07cv2142 (WBS) (E.D. Cal. April 16, 2009)).

## B.  The 363 Sale

On June 1, 2009 — the day before the *Castillo* Settlement would have become effective — Old GM filed for Chapter 11 bankruptcy.  (Voluntary Pet. (Docket No. 1), *In re Motors Liquidation Co.*, 09-bk-50026 (REG) (Bankr. S.D.N.Y. June 1, 2009)).  At the beginning of the bankruptcy proceedings, Old GM moved to sell the majority of its assets pursuant to Section 363 of the Bankruptcy Code to a newly created entity that became New GM — a sale that was negotiated largely between Old GM and the Auto Task Force of the United States Treasury Department ("Auto Task Force").  *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009).  During their negotiations, Old GM and the Auto Task Force discussed which of

Old GM's liabilities New GM ought to assume.  (*See, e.g.*, Buonomo Dep., Docket No. 67, Ex. 3, at 27).  They agreed that New GM ought to assume only those liabilities that were necessary to its ability to operate.  (*See id.* at 27-28).

In fact, a lawyer for Old GM testified that before Old GM filed for bankruptcy, class action settlements, and particularly the *Castillo* Settlement, were expressly identified as liabilities Old GM would retain.  (*See id.* at 44-45).   The understanding that Old GM would retain all liabilities except those necessary to the operations of New GM was made clear to the Bankruptcy Court (and the public) during the hearing on the proposed sale of Old GM.  (June 1, 2009 Hearing Tr. (Docket No. 374) at 36, *In re Motors Liquidation Co.*, 09-bk-50026 (REG) (Bankr. S.D.N.Y. June 3, 2009); July 1, 2009 Hearing Tr. (Docket No. 3205) at 104-06, 111, *In re Motors Liquidation Co.*, 09-bk-50026 (REG) (Bankr. S.D.N.Y. July 15, 2009)).  Consistent with this understanding, Old GM never listed the *Castillo* Settlement on the schedule of executory contracts to be assigned to New GM, and identified it as a contract it should later move to reject during the bankruptcy proceeding.  (*See* New GM Trial Ex. 4, Docket No. 77).

The sale agreement, formally titled the Amended and Restated Master Purchase and Sale Agreement ("Sale Agreement"), does not refer specifically to the *Castillo* class action or any similar liability.  Instead, it identifies the general categories of liabilities to be assumed by New GM.  As relevant here, the agreement provides that New GM would assume "all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment . . . manufactured or sold by Sellers or Purchaser prior to or after the Closing."  (Sale Agreement § 2.3(a)(vii)(A), Docket No. 68, Ex. C; *see also id.* § 6.15(b)).  Conversely, the agreement specified that Old GM retained "all Liabilities

arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers." (*Id.* § 2.3(b)(xvi)). The agreement further clarified, "for avoidance of doubt," that New GM "shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide consumer remedies in addition to or different from those specified in Sellers' express warranties." (*Id.* § 6.15(b)).

On July 5, 2009, the Bankruptcy Court approved the sale to New GM (the "363 Sale"). (Sale Order (Docket No. 2968), *In re Motors Liquidation Co.*, 09-bk-50026 (REG) (Bankr. S.D.N.Y.  July 5, 2009)).  The Court's order approving the sale confirmed the language in the Sale Agreement limiting New GM's assumption of warranty-related liabilities to those stated expressly in a written warranty, providing as follows:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty."  The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.

(*Id.* ¶ 56).  The Sale Agreement and the order approving it thus made clear that New GM would assume only those liabilities arising out of express warranties and that Old GM would retain all other warranty-related liabilities.  The 363 Sale closed — and New GM was legally formed — on July 10, 2009.  (Docket No. 3106, *In re Motors Liquidation Co.*, 09-bk-50026 (REG) (Bankr. S.D.N.Y.  July 5, 2009)).

**C.  Post-363 Sale Events**

After the closing, there was uncertainty within New GM about the company's policy regarding payment for faulty VTi transmissions.  For about a month after the closing, New GM paid to repair or replace them.  (*See, e.g.*, Docket No. 72, Ex. Z).  But during August and early September of 2009, there was a series of internal e-mails among New GM employees seeking guidance about whether to continue paying these claims.  (*See, e.g.*, Docket No. 73, Exs. AA, CC, EE).  Many of these e-mails suggest that the employees believed that the legal responsibility for the *Castillo* Settlement rested with Old GM, but that New GM might nevertheless, as a matter of policy, honor the settlement's terms or otherwise seek to compensate, in part or in full, customers with VTi transmission issues.  (*See, e.g.*, *id.*).

On or about August 4, 2009, there was an internal PowerPoint presentation at New GM discussing the options for how the company could treat claims for defective VTi transmissions. (New GM Trial Ex. 6, Docket No. 77).[3]  According to the PowerPoint slides, the presenter stated that the *Castillo* Settlement had "been assigned to old GM" and that New GM therefore had no obligation to satisfy claims arising under it.  (*Id.*).  Four possible "customer satisfaction/retention options" for moving forward were advanced: (1) "do nothing," as the responsibility for such repairs had been retained by Old GM; (2) "honor the provisions of the 'proposed' class action settlement"; (3) "re-write existing special policy to further extend the warranty time/mileage"; or (4) "provide owners with a voucher . . . towards the purchase of a new GM vehicle."  (*Id.*). Ultimately, according to the slides, the presenter recommended a combination of options three and four.  (*Id.*).

By September 2, 2009, New GM's Customer Assistance Center "knowledge database"

---

[3]      The presentation is actually dated August 4, *2008*.  This is obviously an error, as the presentation refers to events that took place in 2009.

had been updated to make clear that New GM would repair or replace VTi transmissions only according to the terms of the glove-box warranty (as extended by the special policy).  That is, New GM would fix a transmission if it failed within five years or 75,000 miles.  (*See* Docket No. 73, Ex. HH).  On September 28, 2009, New GM sent a message to all Saturn retailers titled "Saturn VTi Transmission Settlement Clarification."  (Docket No. 75, Ex. QQ).  That message stated that New GM "did not assume liability under the [*Castillo*] settlement or otherwise for any reimbursement obligations with respect to the VTi transmission."  (*Id.*).  Therefore, it continued, "the responsibility, if any, to provide reimbursement to customers under the settlement remains with [Old GM] subject to the normal procedures of the Bankruptcy Court."  (*Id.*).  "Going forward," the message provided, "repair of VTi transmissions . . . should be addressed only pursuant to the terms of the 5 year/75,000 mile limited express warranty extension . . . ."  (*Id.*).

Internal GM documents from October 2009 indicate that New GM Chief Executive Officer Fritz Henderson "want[ed] to do more" for Saturn owners experiencing transmission problems than the remedies provided under the five year/75,000 mile limited express warranty extension.  (Docket No. 75, Ex. SS).  Accordingly, New GM implemented a special policy that provided owners of certain Saturn vehicles within eight years or 100,000 miles of purchase the option of receiving either a 50% reimbursement for covered transmission repairs or a $5,000 credit toward the purchase of a new GM vehicle.  (Docket No. 75, Ex. RR).

**D.  The Current Lawsuit**

On August 26, 2009, the *Castillo* Plaintiffs filed this action in the Delaware Court of Chancery, seeking a declaration that New GM had assumed Old GM's obligations under the *Castillo* Settlement.  (*See* Docket No. 3, at 4).  New GM removed the lawsuit to federal court on the basis that it was a core proceeding arising under Title 11 of the Bankruptcy Code.  (*See id.*).

The action was then transferred to the Bankruptcy Court in the Southern District of New York that was overseeing Old GM's bankruptcy — the Court that had presided over the proceedings regarding the 363 Sale and approved the Sale Agreement.  (*See id.*).

Ruling on cross-motions for summary judgment, Bankruptcy Judge Gerber determined that, although "textual analysis" of the Sale Agreement "strongly" supported New GM's argument that Old GM had retained liability for the *Castillo* Settlement (Decision After Trial ("Decision") at 20, Docket No. 58, *available at* 2012 WL 1339496), there was "sufficient ambiguity in the documentation to warrant consideration of extrinsic evidence."  (*Id.* at 18).  After a trial on a stipulated record, the Court found that the extrinsic evidence also "weighs heavily against" the *Castillo* Plaintiffs' assertion that New GM had assumed responsibility for the *Castillo* Settlement.  (*Id.* at 25).  Thus, it held that New GM did not assume the *Castillo* Settlement as part of the 363 Sale.  (*Id.* at 1).  On June 25, 2012, the *Castillo* Plaintiffs filed the instant appeal.  (Docket No. 1).

## DISCUSSION

### A.  Standard of Review

A district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*.  *See In re Bell*, 225 F.3d 203, 209 (2d Cir. 2000); *In re Madoff*, 848 F. Supp. 2d 469, 476 (S.D.N.Y. 2012).  Contract interpretation is generally a question of law. *See Beth Medrash Eeyun Hatalmud v. Spellings*, 505 F.3d 139, 145 (2d Cir. 2007); *In re Brunswick Hosp. Ctr., Inc.*, 156 B.R. 896, 899 (E.D.N.Y. 1993).  Thus, whether a contract is ambiguous and the meaning of an unambiguous contract are legal conclusions, reviewed *de novo*.  *See Spellings*, 505 F.3d at 145; *In re Delphi Corp.*, 394 B.R. 342, 344 (S.D.N.Y. 2008).

Where, however, a contract is ambiguous, its interpretation "in the presence of extrinsic

evidence of meaning" is a question of fact. *Spellings*, 505 F.3d at 145; *see In re Brunswick Hosp. Ctr., Inc.*, 156 B.R. at 899. Therefore, a district court may reverse a bankruptcy court's interpretation of an ambiguous contract only if it is clearly erroneous. *See id.*; *In re Delphi Corp.*, 394 B.R. at 344. A finding is clearly erroneous only if, after reviewing all of the evidence, "the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted). "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 369 (1991) (internal quotation marks omitted); *accord Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003). "The burden of demonstrating that the Bankruptcy Court's findings of fact are clearly erroneous rests squarely on the shoulders of the appellant." *In re Ciena Capital LLC*, 440 B.R. 47, 52 (S.D.N.Y. 2010).[4]

---

[4]     The *Castillo* Plaintiffs argue that the clearly erroneous standard does not apply here because the case was tried on a stipulated record. (Appellants' Br. 12; Appellants' Reply Br. 1). But the cases they cite do not stand for this proposition. As noted above, *Brunswick Hospital Center* actually states precisely the opposite: Although the interpretation of unambiguous contracts is to be reviewed *de novo*, the Court held, "[w]hen the language of the contract is susceptible to more than one reasonable interpretation, the interpretation of the contract is an issue of fact," which should be "reviewed under the clearly erroneous standard." 156 B.R. at 899. Similarly, in *McChesney v. Sims*, 267 F.2d 215, 217 (2d Cir. 1959), the Court stated that "findings of fact of a referee in bankruptcy will not be disturbed unless they are clearly erroneous." The *McChesney* Court did state that where the "credibility of witnesses is not . . . involved" and the "facts are undisputed," a district court, in applying the clearly erroneous standard, may "more freely draw differing inferences from the undisputed facts." *Id.* But the facts in this case *are* in dispute, and the Bankruptcy Court made at least one credibility determination. (*See* Decision 5 ("accept[ing] as true" the deposition testimony of a witness)). Accordingly, there is no reason to apply the clearly erroneous standard "more freely" here than usual. Moreover, even if this Court were to apply such a standard, it would not alter the conclusions reached below. *In re Hygrade Envelope Corp.*, 366 F.2d 584 (2d Cir. 1966), the final case cited by Appellants (Appellants' Reply Br. 1), also does not support their argument. That case holds that application of a legal standard to facts that are "undisputed *or have been found without clear error*" is not itself a finding of fact to be reviewed under a clearly erroneous standard. 366 F.2d at 587-88 & n.4 (emphasis added). The Court reaffirmed that "the resolution

**B.  Contract Interpretation Principles**

The primary question in this case is one of contract interpretation: Is the *Castillo* Settlement a liability assumed by New GM under the terms of the Sale Agreement?  The interpretation of a contract in bankruptcy is governed by state law.  *See In re Delta Air Lines Inc.*, 608 F.3d 139, 146 (2d Cir. 2010).  Here, the Sale Agreement provides that it is to be construed in "in accordance with the Bankruptcy Code and . . . to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York."  (Sale Agreement § 9.12).  Accordingly, New York law applies.

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002); *accord Delta Air Lines*, 608 F.3d at 146; *see In re Lehman Bros., Inc.*, 478 B.R. 570, 585 (S.D.N.Y. 2012).  "The best evidence of what parties to a written agreement intend is what they say in their writing" — that is, the text of the contract itself. *Greenfield*, 98 N.Y.2d at 569 (internal quotation marks omitted); *accord Delta Air Lines*, 608 F.3d at 146.  Therefore, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Greenfield*, 98 N.Y.2d at 569. "A contract is unambiguous where the contract's terms have 'a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion.'"  *Lehman Bros.*, 478 B.R. at 586 (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)); *see SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 189-190 (S.D.N.Y. 2009).  Where, however, "reasonable minds could differ about the meaning of

---

of conflicting testimony and the drawing of factual inferences from circumstantial evidence are protected by the 'unless clearly erroneous' rule."  *Id.* at 588.

contractual language, such language is ambiguous, . . . and the court must turn to extrinsic

evidence to determine the parties' intent." *Lehman Bros.*, 478 B.R. at 586 (citation omitted).

## C.  The Sale Agreement Is Ambiguous

Under the Sale Agreement, New GM assumed "all Liabilities arising under express

written warranties of Sellers."  (Sale Agreement § 2.3(a)(vii)(A)).  There is no dispute that the

glove-box warranty covered defective VTi transmissions.  (*See* Appellants' Br. 2; Appellee's Br.

3).  Nor is there any disagreement that liability for transmission problems that occurred within

five years or 75,000 miles — the warranty period as extended by Old GM's special policy —

arose under the warranty.  (*See* Appellants' Br. 2; Appellee's Br. 3).  The parties thus agree that

New GM assumed liability for any VTi transmission problems that arose within five years or

75,000 miles of vehicle purchase.

The *Castillo* Plaintiffs, however, alleged that their transmissions failed *after* the

expiration of the glove-box warranty.  (*See* SAC ¶¶ 40, 42, 47, 49, 53, 57, 61).  New GM argues

— and the Bankruptcy Court agreed — that defects discovered after the warranty's expiration

are not covered by the warranty, and therefore any claims based on such defects cannot be

understood as arising under it.  (Appellee's Br. 11; Decision 20-22).  New GM relies on the

Second Circuit's decision in *Abraham v. Volkswagen of America, Inc.*, 795 F.2d 238 (2d Cir.

1986), which held that "an express warranty does not cover repairs made after the applicable

time or mileage periods have elapsed." *Id.* at 250.  Under *Abraham*, this rule governs even

where the warrantor knew of the defect at the time of sale, but that defect remained latent until

after the expiration of the warranty.  *See id.*  The *Castillo* Plaintiffs' express warranty claim,

New GM argues, is indistinguishable from the claim at issue in *Abraham*.

But *Abraham* is distinguishable from the *Castillo* class action in an important respect:

The *Castillo* Plaintiffs' express warranty claim was premised not only on Old GM's knowledge of a latent transmission defect — the type of claim at issue in *Abraham* — but also on its failure to adequately repair or replace transmissions that failed within the warranty period.  (SAC ¶ 87). It is because of this failure, the *Castillo* Plaintiffs argued, that their transmissions failed again after the expiration of the warranty.  That is, the *Castillo* Plaintiffs contended that Old GM's alleged failure to adequately repair or replace transmission defects that occurred before the warranty expired constituted a breach of that warranty.  (SAC ¶ 87).  That contention is not governed by *Abraham*.

Nevertheless, the *Castillo* Plaintiffs' claim may not have arisen under the glove-box warranty within the meaning of the Sale Agreement.  A failure to repair transmission defects identified within the warranty period may demonstrate that the remedy provided by the warranty failed of its essential purpose.  *See, e.g.*, *Kraft v. Staten Island Boat Sales, Inc.*, 715 F. Supp. 2d 464, 475 (S.D.N.Y. 2010) (citing "the inability of the warrantor to repair defects" as one way in which a warranty could "fail of its essential purpose" (internal quotation marks omitted)).  The result of such a failure would be to permit the *Castillo* Plaintiffs to seek remedies other than those provided by the warranty.   *See* N.Y. U.C.C. § 2-719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."); *Siemens Credit Corp. v. Marvik Colour, Inc.*, 859 F. Supp. 686, 696 (S.D.N.Y. 1994) ("If [a party] proves at trial that the express warranty failed in its essential purpose, then [that party] will be entitled to sue for damages for breach of implied warranty under N.Y.U.C.C.§ 2-714(2).").

Therefore, the *Castillo* Plaintiffs' claim could be understood not as an attempt to enforce the glove-box warranty, but rather as an effort to void the conditions and limitations contained

therein.  In that case, liability for such a claim would presumably remain with Old GM, as the Sale Agreement provided that New GM "shall not assume Liabilities . . . that provide consumer remedies in addition to or different from those specified in Sellers' express warranties."  (Sale Agreement § 6.15(b)).  In addition, the Bankruptcy Court order approving the sale stated that New GM "is assuming the obligations of the Sellers pursuant to *and subject to conditions and limitations* contained in their express written warranties."  (Sale Order ¶ 56 (emphasis added)).  These provisions suggest that the claim that Old GM failed to effectively repair or replace transmission defects within the warranty period may not have arisen under the glove-box warranty, within the meaning of the Sale Agreement.

But even if that claim *were* understood as "arising under" the glove-box warranty, it would not follow that the Sale Agreement unambiguously assigned liability for the *Castillo* Settlement to New GM.  In addition to the breach of express warranty claim based on Old GM's failure to adequately repair transmission defects discovered within the warranty period, the *Castillo* Plaintiffs also brought claims for statutory consumer fraud; breach of express warranties based on representations in GM's advertising and promotional literature; breach of implied warranty of merchantability; and unjust enrichment.  (SAC ¶¶ 69-80, 84-86, 92-108).  In other words, the *Castillo* Plaintiffs brought one claim that arguably arose from an express warranty, and several others that that arose, instead, from an implied warranty and alleged statements of Old GM — that is, claims that plainly did not arise from the glove-box warranty.  Further, because of the settlement, none of these claims was ever adjudicated; Old GM expressly disclaimed fault in the settlement agreement.  (Settlement Agreement ¶ 1.5).

It is these circumstances, not the meaning of "arising under" — upon which the parties and Bankruptcy Judge Gerber effectively agreed (Decision 23) — that render the Sale

Agreement ambiguous as applied to the *Castillo* Settlement.  One provision of the Sale Agreement states that liabilities "arising under express written warranties" were assumed by New GM (Sale Agreement § 2.3(a)(vii)(A)), while another provision states that liabilities "arising out of, related to or in connection with" implied warranties or statements by Old GM were retained by Old GM.  (*Id.* § 2.3(b)(xvi)).  Each of these provisions is clear enough in its own right.  The Sale Agreement does not, however, make clear what to do with liabilities that arise from a mix of the two categories of claims, let alone liabilities that arise from a settlement rather than an adjudication of such claims — a settlement where Old GM expressly disclaimed fault for any of the claims no less.  That is, the Sale Agreement is ambiguous with respect to how it applies to the *Castillo* Settlement, as reasonable minds could disagree about whether the liability for that settlement fits within the express warranty box, the implied warranty box, or both.  *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Ambiguity in a contract is the inadequacy of the wording to classify or characterize something that has potential significance.  A contract may be ambiguous when applied to one set of facts but not another." (internal quotation marks and brackets omitted)).

Appellants' arguments to the contrary are unpersuasive.  First, Appellants contend that the term "arising under" is unambiguous.  (Appellants' Br. 17-18).  But again, the ambiguity in the Sale Agreement does not arise from disagreement over the meaning of "arising under."  It simply does not matter how broadly or narrowly the term is construed: The ambiguity here stems from the apparent applicability of two conflicting provisions of the Sale Agreement to the *Castillo* Settlement, not from any doubt about the meaning of either provision.  Appellants' argument that the Bankruptcy Court "ignored the definition of Liabilities" in the Sale Agreement (Appellants' Br. 28), is similarly without merit.  Plaintiffs contend that the definition includes

"unproven claims in a lawsuit." (Appellants' Br. 28 (internal quotation marks and emphasis omitted)). But again, the problem with Appellants' argument is not that their express warranty claim was unproven, but that the *Castillo* Settlement settled not only an unproven claim that may have arisen out of the glove-box warranty, but several other claims that certainly did not — and therefore were unambiguously retained by Old GM.

*In re Safety-Kleen Corp.*, 380 B.R. 716, 736 (Bankr. D. Del. 2008), upon which Appellants rely, does not suggest otherwise. In that case, Chapter 11 debtor Safety-Kleen Corp. ("Safety-Kleen") sold one of its operating divisions to Clean Harbors, Inc. ("Clean Harbors"). *Id.* at 719. The sale agreement provided that Clean Harbors would assume "liabilities and obligations arising under Environmental Laws (or other Laws) that relate to violations of Environmental Law." *Id.* at 729 (internal quotation marks omitted). Relying on this provision, the Bankruptcy Court held that Clean Harbors had assumed obligations "under . . . two [s]ettlement [a]greements which were the product of two governmental environmental claims" — that is, that it was obligated under the settlement agreements to reimburse a third party for certain liabilities, which that party owed the government based on environmental claims. *Id.* at 723. As the Court reasoned, the settlement agreements "evidence obligations arising under [environmental laws] CERCLA and the Spill Act, and settle direct and third-party claims arising under or with respect to such statutes. As such, they are liabilities and obligations . . . arising under Environmental Laws (or other Laws) that relate to violations of Environmental Laws." *Id.* at 736 (internal quotation marks omitted) (second alteration in original). There was, however, no dispute that the claims at issue were environmental claims. Here, by contrast, the parties sharply dispute whether any claims at all may be considered to arise from the glove-box warranty. At most, only one claim in the *Castillo* lawsuit was based on that warranty; the remainder of the

claims were those for which Old GM explicitly retained liability under the Sale Agreement. Accordingly, the *Castillo* Plaintiffs' argument that *Safety-Kleen* governs this case fails.

For similar reasons, Appellants' contention that both Old GM and New GM have "admitted" that the Sale Agreement assigns New GM liabilities "with an origin in" Saturn's express written warranty (Appellants' Br. 21) falls short.  Appellants note, for example, that in another case involving several different claims, *Kodsy v. General Motors Corp.*, No. 09-CA-011174 (Fla. Cir. Ct.), New GM was substituted for Old GM as the defendant with respect to the one claim alleging breach of an express written warranty.  (Docket No. 72, Ex. W-2).  They also observe that New GM stated before the Bankruptcy Court that "New GM continues to provide covered repairs free-of-charge" on vehicles with unexpired glove-box warranties "[b]ecause these warranties fall squarely within [the Sale Agreement's] definition of assumed warranty obligations."  (Appellants' Br. 22 (internal quotation marks omitted)).  But New GM's admission that it assumed liabilities with an origin in the glove-box warranty is irrelevant.  New GM has never argued otherwise.  The dispute — and the ambiguity in the Sale Agreement — is whether the *Castillo* Settlement constitutes such a liability.  New GM has made no admission relevant to that dispute.

Finally, the *Castillo* Plaintiffs argue that the principles of "*res judicata* and comity prohibited the bankruptcy court from deciding a fact issue in the underlying *Castillo* case." (Appellants' Br. 29)  Appellants' argument seems to be that the Bankruptcy Court found that they had not brought a breach of express warranty claim in the *Castillo* litigation and that this finding is barred by the settlement agreement.  (*See id.*).  But the question here is the meaning of the Sale Agreement — and its application to the *Castillo* Settlement — and those issues were not litigated in the *Castillo* case.  *See Federated Dep't Stores v. Moitie*, 452 U.S. 394, 398 (1981)

(explaining that "the doctrine of res judicata . . . precludes the parties or their privies from
relitigating" in subsequent litigation " issues that were or could have been raised" in the original
lawsuit).  Moreover, as explained above, even if the Second Amended Complaint in *Castillo*
were construed — contrary to the Bankruptcy Court's interpretation — to include a claim arising
under the glove-box warranty, that construction would not resolve the ambiguity of the Sale
Agreement as applied here.

### D.  Extrinsic Evidence

In short, the Sale Agreement is indeed ambiguous, albeit perhaps for reasons other than
those proffered by the Bankruptcy Court.  Whatever the reasons, the Bankruptcy Court therefore
did not err in looking to extrinsic evidence to determine how the parties to the Sale Agreement
intended for it to be applied to the *Castillo* Settlement.  *See Lehman Bros.*, 478 B.R. at 586.  The
question thus becomes whether Appellants have shown that Bankruptcy Judge Gerber's finding
that the parties to the Sale Agreement intended for Old GM to retain liability for the *Castillo*
Settlement is clearly erroneous.  *See In re Delphi Corp.*, 394 B.R. at 344.  They have not.
Indeed, the extrinsic evidence strongly supports the conclusion that both Old GM and the Auto
Task Force — the parties that negotiated the Sale Agreement — intended for Old GM to retain
liability for the *Castillo* Settlement and similar obligations. In addition, there is substantial
evidence that, despite some initial confusion, this was New GM's understanding as well.

The Bankruptcy Court relied on several categories of extrinsic evidence to support its
conclusion that the Sale Agreement did not assign the *Castillo* Settlement to New GM.  First, it
examined the negotiations between Old GM and the Auto Task Force before Old GM filed for
bankruptcy.  The Court found that lawyers for both parties "understood and agreed that the goal
was to leave as many liabilities behind with Old GM" as possible and to assign to New GM only

those liabilities "that were commercially necessary." (Decision 25-26).  In particular, the Court focused on two telephone calls between representatives of Old GM and the Auto Task Force, during both of which the representatives agreed that Old GM would retain liability for settlement agreements like the *Castillo* Settlement.  (*Id.* at 26).  In fact, in one call, the *Castillo* Settlement was specifically identified as a liability that "would be 'left behind' with Old GM."  (*Id.*).

Next, Bankruptcy Judge Gerber turned to evidence from the time period between Old GM's filing for bankruptcy and the closure of the 363 Sale.  The Court found that this evidence also demonstrated the intent of Old GM and the Auto Task Force that Old GM retain responsibility for the class action settlements, including the *Castillo* Settlement.  (*Id.* at 27).  During the hearing on the 363 Sale, Representatives of Old GM and the Auto Task Force reaffirmed their intent that New GM take on as few liabilities as possible.  (*Id.*).

In addition, the Bankruptcy Court noted, some state attorneys general objected to the sale and urged that New GM be assigned more liabilities, including liability for violations of state lemon laws and expanded liability for implied, express, and statutory warranty claims.  (*Id.*).  During a conference call, representatives of Old GM and the Auto Task Force discussed their concern that were New GM to assume expanded warranty obligations, it would "assum[e] the entire class action docket, which included the *Castillo* Settlement Agreement."  (*Id.*).  To avoid this possibility, they changed the Sale Agreement to assign New GM liabilities under state lemon laws, but declined to assign New GM any additional warranty obligations.  (*Id.*).  The Bankruptcy Court construed this evidence as demonstrating that the parties to the Sale Agreement considered "broaden[ing] New GM's liability to include the" *Castillo* Settlement, "but instead made a conscious decision to leave behind, with Old GM, the *Castillo* Settlement Agreement and other class action liabilities like it."  (*Id.*).

Finally, the Court examined evidence from after the closure of the 363 Sale. Although for a short time New GM paid to repair or replace defective VTi transmissions that were no longer under warranty, Bankruptcy Judge Gerber found that the reason New GM did so was not because it understood the Sale Agreement to have assigned to it liability for the *Castillo* Settlement. Instead, the Court determined, "[t]he evidence establishes inertia after the closing, . . . a period of a few weeks of uncertainty and delay before New GM personnel focused on their legal rights." (*Id.* at 29). There is substantial evidence in the record to support this conclusion.

For example, internal communication within New GM indicates that following the 363 Sale, the company believed it needed to decide what its policy with respect to the VTi transmissions would be, a decision it would not need to — and indeed, legally could not — make, had it assumed liability for the *Castillo* Settlement. (*See, e.g.*, Docket No. 73, Exs. DD, EE; New GM Trial Ex. 5, Docket No. 77). Less than two months after the closure of the 363 Sale, New GM officially implemented a policy of compensating customers for transmission defects only within the terms of the glove-box warranty. (*See* Docket No. 73, Ex. HH; *see also id.* Ex. QQ). Given this evidence, Bankruptcy Judge Gerber found that there was "no indication that New GM believed it had to pay VTi transmission claims because it believed it had assumed the Settlement Agreement under the Sale Agreement, and had a legal obligation to do so." (Decision 29 (emphasis omitted)).[5]

---

[5]     Appellants briefly argue that if the Bankruptcy Court was correct and New GM paid for out-of-warranty transmission repairs simply due to inertia and goodwill, such payments would constitute an illegal "secret warranty." (Appellants' Br. 35-36). As an initial matter, at least one state statute prohibiting such warrantees has an exception for "ad hoc adjustments made by a manufacturer on a case-by-case basis." Cal. Civ. Code § 1795.90(d). New GM's payments may indeed fall within this exception. Regardless, whether New GM's payments violated any state statutes is a separate question from whether the company viewed the payments as resulting from

The *Castillo* Plaintiffs argue that "the extrinsic evidence relied upon by the bankruptcy court did not . . . involve the contractual term" at issue. (Appellants' Br. 31 (internal quotation marks omitted)). The Bankruptcy Court, they contend, erred in "rely[ing] upon generalized concepts of intent without any contractual hook to the language in dispute whatsoever." (*Id.* (internal quotation marks omitted)). This contention is without merit. The Sale Agreement is ambiguous with respect to whether the liabilities retained by New GM included agreements, such as the *Castillo* Settlement, that settled both claims arguably assumed by New GM and claims clearly retained by Old GM. The extrinsic evidence upon which the Bankruptcy Court relied makes plain the intent of Old GM, the Auto Task Force, and New GM on precisely this question.

Appellants further argue that any evidence that New GM did not view the *Castillo* Settlement as an assumed liability occurred after the *Castillo* Plaintiffs initiated this adversary proceeding, and therefore ought to be disregarded. (Appellants' Br. 19). But much of the internal communication cited by Bankruptcy Judge Gerber — including several e-mails and the PowerPoint presentation stating that the *Castillo* Settlement had "been assigned to old GM" — occurred before Appellants filed their complaint. Furthermore, although New GM officially adopted its policy limiting remedies for transmission defects to those provided in the glove-box warranty on September 2, 2009, several days after this lawsuit was filed, the complaint was not served on New GM until that day. (Lines Dep., Docket No. 67, Ex. 4, at 42). There is nothing in the record to suggest that New GM was aware of the lawsuit when it drafted or implemented the policy. There is, therefore, no reason to disregard this evidence.

The evidence cited by the *Castillo* Plaintiffs to support their contention that New GM understood the *Castillo* Settlement to be an assumed liability is insufficient to demonstrate clear

---

an obligation it assumed under the Sale Agreement or as resulting from something else, such as inertia or the desire to increase customer goodwill.

error.  First, they point to a letter ostensibly from the New GM legal department to two GM customers stating that the *Castillo* Settlement's terms were more favorable than the special policy then in effect regarding transmission repairs, and therefore "[i]t would be to [their] advantage to participate in the proposed class action lawsuit."  (Docket No. 76, Ex. BBB, *cited at* Appellants' Br. 22).  As an initial matter, the person who wrote that letter was not a New GM employee, let alone a member of the legal department.  (Cernak Decl. ¶¶ 2, 4).  She was a non-lawyer customer service agent employed by a third-party supplier of customer service personnel.  (*Id.*).  Thus, the Bankruptcy Court did not err in disregarding the letter (*see* Decision 16 n.50), as it is of little, if any, evidentiary value here.  Furthermore, the letter does not actually express any opinion on whether New GM assumed the *Castillo* Settlement.  (*See* Docket No. 76, Ex. BBB).  It merely says that the customers to whom it was written would be better off seeking compensation under the settlement than under New GM's policy with respect to transmission repairs.  (*See id.*).  The letter, in short, is irrelevant to the current dispute.

　　　　Second, the *Castillo* Plaintiffs highlight the "number of VTi claims" and the "amount spent" to repair VTi transmissions in the period just after the 363 Sale closed.  (*See* Appellants' Br. 33).  But this spending does not necessarily demonstrate that New GM believed that it had assumed liability for the *Castillo* Settlement.  It is equally plausible that New GM understood the *Castillo* Settlement to be the responsibility of Old GM, but nevertheless undertook these repairs out of inertia or to enhance goodwill; upon realizing how expensive such repairs would be, the company decided to limit them to those covered by the glove-box warranty.  Particularly given the other evidence in the record suggesting that New GM did not view the *Castillo* Settlement as an assumed liability, Bankruptcy Judge Gerber certainly did not clearly err in adopting the latter

interpretation. *See Ceraso*, 326 F.3d at 316 (stating that "the factfinder's choice" between two plausible interpretations of the record "cannot be clearly erroneous").

Third, Appellants note that New GM "repeatedly" categorized the payments it made after the 363 Sale to repair VTi transmissions, even those for which the glove-box warranty had expired, as "warranty" payments. (Appellants' Br. 33). But Dale Hall, who, during the relevant time period, was the Manager of New GM's Warranty Administration, testified that "it was common" for New GM employees to categorize as "'warranty' repairs" not just those repairs covered by the glove-box warranty, but any repairs for which the company, rather than the customer, would pay. (Hall Decl., Docket No. 66, Ex. 5, at ¶ 6). "[A] wide variety of claims," including "recall claims and good will repairs provided in the interest of customer satisfaction" were thus categorized as "warranty" claims. (*Id.* ¶¶ 4-6). Therefore, the characterization of a particular payment as a warranty payment did not necessarily mean that it arose under the glove-box warranty, within the meaning of the Sale Agreement.

In short, although there is some evidence in the record that supports Appellants' contention that New GM understood itself to have assumed liability for the *Castillo* Settlement, there is substantial evidence to the contrary. Furthermore, all of the evidence from before the 363 Sale closed indicates that the parties to the Sale Agreement intended that Old GM retain liability for the settlement. It follows that Appellants have not shown that Bankruptcy Judge Gerber erred, let alone clearly erred, in holding that liability for the *Castillo* Settlement remained with Old GM. *See Hernandez*, 500 U.S. at 369 ("[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Accordingly, his decision after trial must be affirmed.

**CONCLUSION**

For the reasons discussed above, the judgment of the Bankruptcy Court is AFFIRMED, and New GM's motion to dismiss the appeal is DENIED as moot.  The Clerk of Court is directed to terminate the pending motion (Docket Nos. 29) and to close this case.

SO ORDERED.

Dated: September 30, 2013
       New York, New York

_____
JESSE M. FURMAN
United States District Judge